IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| JOSE LEONARDO BRITO GUEVARA, and BEATRIZ ZULAY GUEVARA FLORES, | § § § | |
| Petitioners, | § § | |
| | § | Civil Action No. 3:23-CV-01726-E |
| v. | § § | |
| SAMANTHA ESTEFANIA FRANCISCO CASTRO, | § § § | |
| Respondent. | § § | |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Before the Court is Petitioners Jose Leonardo Brito Guevara's ("Petitioner Brito") and Beatriz Zulay Guevara Flores's ("Petitioner Guevara") Complaint and Petition for Return of Child (the "Petition") under the Hague Convention (the "Convention"), and its implementing United States legislation, the International Child Abduction Remedies Act (the "ICARA"). (ECF No. 1). Petitioners seek the return of the minor A.F., asserting that Respondent Samantha Estefania Francisco Castro ("Respondent") wrongfully removed her from Venezuela to the United States.

Beginning on March 21, 2024, the Court held a two-day bench trial and heard testimony from Petitioner Brito via Zoom in Spain and Petitioner Guevara via Zoom in Venezuela, and in-person testimony from Respondent. The minor subject to this suit for return—A.F.—was not present for the trial. After ample consideration of the petition, testimony, exhibits, briefing, and all arguments made, the Court now enters its Findings of Fact and Conclusions of Law pursuant to Federal Rule of Civil Procedure 52(a).[1]

---

[1] To the extent that any finding of fact is more aptly characterized as a conclusion of law, or any conclusion of law is more aptly characterized as a finding of fact, the Court adopts it as such.

## I.  BACKGROUND

### A.    Venue

On April 19, 2023, Petitioners filed the Petition in federal court, originally assigned to Judge Sean D. Jordan of the Eastern District of Texas. Judge Jordan held a hearing on Petitioners' motion for temporary restraining order on May 2, 2023, and subsequently granted Petitioners' motion. After granting a few motions to extend the TRO, Judge Jordan held a hearing for Petitioners' motion for preliminary injunction on June 1, 2023.  As Respondent had not yet been located or served, Judge Jordan granted the preliminary injunction. On August 1, 2023, Judge Jordan concluded that A.F. was located in the Northern District of Texas, Dallas Division on April 19, 2023—the day the Petition was filed. Thus, this case was transferred to the Northern District of Texas—specifically this Court—on August 1, 2023, as venue is proper "where the child is located at the time the petition is filed." *See* 42 U.S.C. § 11603(b).

### B.    Pretrial Motions

The Court held a bench trial on March 21, 2024, and March 22, 2024, at which time there were three pending motions before the Court: (i) Respondent's motion for summary judgment, (ECF No. 75), filed on December 31, 2023, asserting that Petitioner Guevara lacked custody rights as to A.F.; (ii) Respondent's motion in limine, (ECF No. 100), filed on February 22, 2024; and (iii) Petitioners' motion to exclude expert testimony, (ECF No. 121), filed on March 15, 2024. The Court addressed all three motions during the pretrial hearing held on March 18, 2024, and will now summarize the Court's conclusions.

The Court **denied** Respondent's motion for summary judgment as to Petitioner Guevara, concluding a genuine dispute of material fact existed.[2] (ECF No. 75). After oral argument, the

---

[2] The Court will more fully address the issue of whether Petitioner Guevara has custody right in the analysis below, but for clarity purposes, the motion is deemed denied.

Court **denied** Respondent's motion in limine in its entirety, (ECF No. 100), and **granted** Petitioners' motion to exclude expert testimony, as Respondent untimely designated the witness— Nelson Leon—as an expert. (ECF No. 121).

## C.    Summary of Claims and Defenses of Each Party[3]

### 1.    Petitioners' Claims

This action has been filed pursuant to the United Nations Hague Convention on the Civil Aspects of International Child Abduction (the "Hague Convention"), T.I.A.S. No. 11670, 19 I.L.M. 1501, and the International Child Abduction Remedies Act ("ICARA"), 22 U.S.C. § 9001 et seq., seeking the immediate return to Venezuela of Petitioner Mr. Brito's minor daughter and Petitioner Ms. Guevara's minor granddaughter, A.F., who was removed from Venezuela and then wrongfully retained in the United States by Respondent. In accordance with 22 U.S.C. § 9007, Petitioners also request that this Court award all necessary expenses incurred by or on behalf of Petitioners, including court costs, legal fees, transportation costs related to the return of the Child, and any and all other reasonable and necessary fees incurred during the course of proceedings in this action.

### 2.    Respondent's Claims

Respondent Ms. Castro generally denies Petitioners' allegations and that they are entitled to the relief sought in this action. In addition, Respondent asserts the following specific defenses: (1) Ms. Guevara has no basis for claiming a custody right with respect to A.F.; (2) the removal action was not commenced within one year of the allegedly wrongful removal of A.F., and A.F. is well-settled in her new environment; (3) Petitioners were not actually exercising any purported custody rights at the time of the alleged removal or retention, consented or acquiesced to the

---

[3] The following information is taken verbatim from the Parties' Proposed First Amended Joint Pretrial Order. (ECF No. 126).

removal, and/or have not exercised or tried to exercise any purported custody rights after removal; and (4) there is a grave risk that A.F.'s return will expose her to physical or psychological harm or otherwise place her in an intolerable situation.

## II.    FINDINGS OF FACT

### A.    Agreed Findings of Fact[4]

The following facts are stipulated to by the Parties:

1.    A.F. was born on May 3, 2018, in Yaracuy, Venezuela.

2.    A.F. is a Venezuelan citizen.

3.    A.F. is not a United States citizen.

4.    Ms. Castro is A.F.'s biological mother.

5.    Ms. Castro is a Venezuelan citizen.

6.    Ms. Castro is not a United States citizen.

7.    Ms. Castro currently lives in the United States.

8.    Ms. Castro has lived in the United States since December 2021.

9.    Mr. Brito is A.F.s biological father.

10.    Mr. Brito is a citizen of both Venezuela and Spain.

11.    Mr. Brito is not a United States citizen.

12.    Mr. Brito currently lives in Spain.

13.    Mr. Brito has lived in Spain since August 2021.

14.    Mr. Brito visited the United States in 2018.

15.    Ms. Castro and Mr. Brito were never married.

---

[4] The following "Agreed Findings of Fact" come verbatim from the Parties' Proposed First Amended Joint Pretrial Order. (ECF No. 126).

16.	Ms. Guevara is Mr. Brito's mother and A.F.'s paternal grandmother.

17.	Ms. Guevara is a citizen and resident of Venezuela.

18.	Ms. Guevara has resided at San Jose calle 19 con Carrera 19, Yaritagua Estado Yaracuy, Venezuela since before A.F. was born.

19.	After A.F. was born and until July 19, 2019, Mr. Brito, Ms. Castro, and A.F. resided in Ms. Guevara's home with Ms. Guevara in Venezuela.

20.	In August 2021, Mr. Brito, alone, moved from Venezuela to Madrid, Spain.

21.	Mr. Brito has not been back to Venezuela since he moved to Spain.

22.	On November 27, 2021, Ms. Castro and A.F. left Venezuela.

23.	On November 30, 2021, Ms. Castro and A.F. presented themselves to the United States Border Patrol in San Luis, Arizona.

24.	Prior to November 2021, A.F. had lived only in Venezuela.

25.	On January 20, 2022, Ms. Guevara filed with the Venezuelan Central Authority for the Discharge of the Hague Convention on Civil Aspects of the International Child Abduction of 25 October 1980 the Application Form (the "Hague Application") regarding A.F.

26.	Ms. Castro does not currently have Lawful Permanent Residence status (also commonly referred to as a "Green Card") in the United States.

27.	A.F. does not currently have Lawful Permanent Residence status (also commonly referred to as a "Green Card") in the United States

28.	Ms. Castro and A.F. have actively pending asylum applications.

29.	Ms. Castro and A.F. are currently awaiting their asylum interview with USCIS.

30. Mr. Otton Rodriguez has been Ms. Castro's romantic partner since May 2021.

31. Mr. Otton Rodriguez has an actively pending asylum application with the USCIS.

32. Ms. Castro and A.F. resided with Mr. Rodriguez at 940 W. Round Grove Road, Apt. 121, Lewisville, Texas 75067 from December 4, 2021, until October 28, 2022.

33. Ms. Castro and A.F. have resided with Mr. Rodriguez at 15480 Dallas Parkway, Apt. 3031, Dallas, Texas 75248 from October 28, 2022.

34. Ms. Castro has held the following employments in the United States:

   a. Cynergy

      i. 4055 Corporate Dr., #400, Grapevine, TX 76051

      ii. Approx. December 2021 – February 2022

      iii. $12/hr

      iv. Est. 40 hrs/week

   b. Great Wolf Lodge

      i. 100 Great Wolf Dr, Grapevine, TX 76051

      ii. Approx. March 2022 – July 2022

      iii. $16/hr

      iv. Est. 45 hrs/week

   c. Residence Inn

      i. 755 E Vista Ridge Mall Dr, Lewisville, TX 75067

      ii. Approx. September 2022 – June 2023

       iii.  $14/hr

       iv.  Est. 45 hrs/week

  d.  Paycom

       i.  3489 State Hwy 121, Grapevine, TX 76051

       ii.  Approx. June 2023 – Present

       iii.  $16.20/hr

       iv.  Est. 40 hrs/week

35.    Between December 2021 and October 2022, A.F. received daily care from Maria de los Angeles de Alvarado at 1845 Chisholm Trail, Lewisville, Texas 75077.

36.    On November 20, 2022, Ms. Castro opened her first bank account in the United States.

37.    On February 21, 2023, the USCIS granted Mr. Otton Rodriguez Temporary Protected Status under Section 244 of the Immigration and Nationality Act.

38.    On April 19, 2023, Petitioners commenced the instant proceeding.

39.    On May 22, 2023, the USCIS issued employment authorization documentation for Ms. Castro.

40.    On May 31, 2023, the USCIS issued employment authorization documentation for A.F.

41.    On August 14, 2023, A.F. began attending kindergarten fulltime at George Herbert Walker Bush Elementary School, 3939 Spring Valley Road, Addison, Texas 75001.

42.    On August 14, 2023, A.F. saw her primary care physician, Dr. Maria Harris, 8112 Spring Valley Road, Dallas, Texas 75240, for a routine health examination and immunizations.

43.    From October 2022 until beginning at George Herbert Walker Bush, A.F. received daily care from Aliria Xiomaria Castro Torreyes at 15417 Preston Rd., Apt. 2157, Dallas, TX 75248.

44.    Mr. Brito and Ms. Guevara did not personally inform Ms. Castro of the Lawsuit prior to filing the Lawsuit.

45.    Mr. Brito and Ms. Guevara did not personally inform Ms. Castro of the Lawsuit prior to Ms. Castro accepting service through counsel.

**B.    Other Findings of Fact**

1.    A.F. continued to routinely interact with both Respondent and Petitioner Guevara after July 19, 2019, but the location of her actual residence at that time is uncertain.

2.    Respondent had mentioned to Petitioners that she was considering traveling to the United States prior to November 27, 2021, but did not explicitly inform them that she was planning on taking A.F with her.

3.    Petitioner Brito did not give Respondent permission to remove A.F. from Venezuela to the United States.

4.    Petitioner Brito provided ample emotional and financial support to A.F. while she resided in Venezuela prior to her removal.

5.    Respondent and A.F. surrendered themselves to border patrol immediately upon entry into the United States.

6.  A.F. has consistently had stable housing in the United States, having only lived at two different locations since arriving in Texas.

7.  Respondent is financially secure and amply provides for A.F., with the help of her partner, Mr. Otton Rodriguez.

8.  Mr. Otton Rodriguez cares deeply for A.F. and acts as a father-figure in her life.

9.  A.F. has formed significant connections to her environment in Texas—stronger than her connections to Venezuela.

### III.  CONCLUSIONS OF LAW

**A.    Agreed Conclusions of Law[5]**

1.  The International Child Abduction Remedies Act ("ICARA"), 22 U.S.C. § 9001, *et seq*, is the United States' implementing legislation for the Hague Convention on the Civil Aspects of International Child Abduction (the "Convention").

2.  The Convention and ICARA are applicable in this case.

3.  This Court has jurisdiction over this case under 22 U.S.C. § 9003(a) and 28 U.S.C. § 1331 because the case involves the allegedly wrongful removal of a child under the age of sixteen from her habitual residence in Venezuela to the United States.

4.  A.F. was a habitual resident of Venezuela prior to her removal to the United States.

---

[5] The Following "Agreed Conclusions of Law' come verbatim from the Parties' Proposed Joint Pretrial Order. (ECF No. 126.

5.      For purposes of the Convention, Petitioner Brito has at least some rights of custody over A.F. under Venezuelan law.

**B.      The Hague Convention and ICARA**

The Hague Convention was specifically adopted to address "the problem of international child abductions during domestic disputes." *Abbott v. Abbott*, 560 U.S. 1, 8 (2010). "The Convention seeks to secure the prompt return of children wrongfully removed to or retained in any Contracting State, and to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting States." *Abbott*, 560 U.S. at 8. At the core of these objectives is the return remedy: "[w]hen a child under the age of 16 has been wrongfully removed or retained, the country to which the child has been brought must order the return of the child forthwith, unless certain exceptions apply." *Abbott*, 560 U.S. at 8. A removal is "wrongful" when the removal of the child violates "rights of custody." *Abbott*, 560 U.S. at 8. "The return remedy determines the country in which the custody decision is to be made; it does not make that decision." *Sanchez v. R.G.L.*, 761 F.3d 495, 503 (5th Cir. 2014). By focusing on the return of the child, the Hague Convention seeks to "restore the pre-abduction status quo and to deter parents from crossing borders in search of a more sympathetic court." *England v. England,* 234 F.3d 268, 271 (5th Cir. 2000).

In 1988, Congress enacted ICARA—the legislation implementing the Hague Convention in the United States. *See Abbott*, 560 U.S. at 9. Under ICARA:

> Any person seeking to initiate judicial proceedings under the Convention for the return of a child or for arrangements for organizing or securing the effective exercise of rights of access to a child may do so by commencing a civil action by filing a petition for the relief sought in any court which has jurisdiction of such action and which is authorized to exercise its jurisdiction in the place where the child is located at the time the petition is filed.

22 U.S.C. § 9003(b). Congress has expressly declared that the provisions in ICARA "are in addition to and not in lieu of the provisions of the Convention." 22 U.S.C. § 9001(b)(2). "The petitioner bears the burden of showing, by a preponderance of the evidence, that the removal or retention was wrongful, § 11603(e)(1)(A); the respondent, of proving any affirmative defenses, § 11603(e)(2)." *Sealed Appellant v. Sealed Appellee*, 394 F.3d 338, 342 (5th Cir. 2004).

Both the United States and Venezuela are signatories to the Convention, and A.F. is a child under the age of sixteen who was removed from her country of habitual residence. Thus, the Convention and ICARA are applicable to this case.[6]

### C.    Petitioners' Prima Facie Case

A petitioner seeking the return of a child under ICARA has the burden of proof to establish by a preponderance of the evidence that "the child has been wrongfully removed or retained within the meaning of the Convention." 42 U.S.C. § 11603(e)(1)(A). A removal or retention is wrongful when: (1) "it is in breach of rights of custody attributed to a person . . . either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention"; and (2) "at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention." Convention, art. 3; *see Sealed Appellant*, 394 F.3d at 343.

Thus, to prove a prima facie entitlement to the return remedy, Petitioners must show by a preponderance of the evidence that: (1) Venezuela was A.F.'s habitual residence immediately prior

---

[6] The Court also notes that during Pretrial on March 18, 2024, the Court took judicial notice of the following as permitted by Article 14 of the Convention: (1) the Hague Convention on the Civil Aspects of International Child Abduction ("the Convention"); (2) the International Child Abduction Remedies Act ("ICARA"); (3) the Hague Convention on the Civil Aspects of International Child Abduction, Text and Legal Analysis; (4) the status of the United States of America and Venezuela as signatories to the Hague Convention on the Civil Aspects of International Child Abduction; (5) Public Notice 957; (6) The National Assembly of the Bolivarian Republic of Venezuela G.O. 5,859 - Organic Law for the Protection of Children and Adolescents ("Organic Law"); and (7) the Venezuelan Constitution, as shown in ECF No. 22-3 in the instant matter.

to removal; (2) both Petitioner Brito and Petitioner Guevara had "rights of custody" under Venezuelan law that were violated by the removal; and (3) both Petitioner Brito and Petitioner Guevara were exercising their rights of custody at the time Respondent removed A.F. to the United States. If Petitioners meet this burden, A.F. will be returned to Venezuela as the ICARA requires the prompt return of a child who is wrongfully removed or retained, "unless one of the narrow exceptions set forth in the Convention applies." 22 U.S.C. § 9001(a)(4).

### 1. Habitual Residence

"A child's habitual residence depends on the particular circumstances of each case"—such inquiry is fact-driven. *Monasky v. Taglierei*, 589 U.S. 68, 79 (2020). Here, however, the Court need not engage in such an inquiry as the Parties stipulated that Venezuela was A.F.'s habitual residence prior to her removal to the United States. Thus, Petitioners have established the first element of their prima facie case.

### 2. Rights of Custody

The Convention defines "rights of custody" to "include rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence." *Abbott*, 560 U.S. at 11 (quoting Convention, art. 5(a)). A parent is not required to have sole or exclusive custody over the child—"the Convention recognizes that custody rights can be decreed jointly or alone." *Abbott*, 560 U.S. at 11. Whether rights of custody have been breached is determined "under the law of the State in which the child was habitually resident immediately before the removal or retention." Convention, art. 3(a). Accordingly, the Court analyzes Venezuelan law to determine if the removal of A.F. from Venezuela breached Petitioners' rights of custody.

#### (i) Petitioner Brito

The Parties stipulated to the fact that Petitioner Brito had at least some rights of custody as to A.F. under Venezuelan law, thus Respondent's removal of A.F. without Petitioner Brito's

explicit permission—as evidenced by testimony and exhibits at trial—violated his rights of custody. Accordingly, the Court concludes that Petitioner Brito has satisfied the second element of his prima facie case by a preponderance of the evidence.

(ii)    Petitioner Guevara

The issue of whether Petitioner Guevara had rights of custody under Venezuelan law as the paternal grandmother to A.F. was hotly contested throughout these proceedings. Although disputed whether an oral custody agreement was in place, neither Petitioners nor Respondent put forth evidence of a formal custody agreement. "When there is no such agreement between parents, courts must apply the laws of the country of the child's habitual residence to determine if the non-removing parent had rights of custody within the meaning of the Convention." *Sealed Appellant*, 394 F.3d at 343. "The Court may take notice directly of the law of, and of judicial or administrative decisions, formally recognized or not in the State of the habitual residence of the child, without recourse to specific procedures for the proof of that law or for the recognition of foreign decision which would otherwise be applicable." *Soonhee Kim v. Ferdinand*, 287 F. Supp. 3d 607, 624 (E.D. La. 2018) (quoting Hague Convention, art. 14); *see also* Fed. R. Civ. P. 44. Further, "[t]he Court may consider affidavits of foreign law to establish rights of custody." *Soonhee Kim*, 287 F. Supp. 3d at 624 (quoting *Whallon v. Lynn*, 230 F.3d 450, 455 (1st Cir. 2000)).

Under Venezuelan law,[7] grandparents are not given rights of custody, nor has Petitioner Brito or Respondent relinquished their custody rights. Thus, in order for Petitioner Guevara to have rights of custody over A.F., one of the special circumstances awarding a third-party custody would have to apply. Article 400 of *Ley Orgánica* titled "Delivery by parents to a third party" states:

---

[7] The applicable Venezuelan law is *Ley Orgánica para la Protección del Niño, Niñas y Adolescentes of 1998* ("*Ley Orgánica*").

When a boy, girl or adolescent has been handed over for upbringing by his or her father or mother, or by both, to a third party capable of exercising Parenting Responsibility, the judge, prior to the respective report, will consider this as the first option for granting family placement for that child or adolescent.

Petitioners' point to a few different judicial rulings to support their conclusion that Petitioner Guevara did indeed have rights of custody over A.F. The first is the Protective Measure for Family Placement ("Protective Measure") granted to Petitioner Guevara after A.F.'s removal from Venezuela. However, because this was petitioned for and granted after A.F.'s removal—specifically a month after—it is irrelevant to the custody determination at *the time of removal*. Thus, it cannot suffice to establish Petitioner Guevara had custody rights.

Second, Petitioners contend that Petitioner Guevara possessed a power of attorney—authorized by Petitioner Brito—entitling her to make decisions on behalf of A.F., including travel authorizations. The Court notes that the document referenced to allegedly convey such power of attorney as to Petitioner Guevara was in Spanish and an English translation was not provided. It is not the Court's duty to translate pertinent documents for the parties. Thus, Petitioners provide no evidentiary support to this proposition, and such bare legal conclusion cannot suffice to bestow custody rights upon an individual.

Further, Petitioners offered evidence of a Certificate from the Council for Protection of Children and Adolescents in Venezuela, presented to Petitioner Guevara. However, all such certificate stated is that Respondent did not have the authority to "undertake any journey inside or outside the Country." Petitioners also introduced another document from the same Council, but it merely conveyed notice for Respondent to appear for a hearing. Neither of these documents give Petitioner Guevara rights of custody under Venezuelan law.

It is a petitioner's burden to prove each element of her prima facie case by a preponderance of the evidence, and here, Petitioner Guevara fails to meet that burden. Thus, as Petitioner Guevara

cannot prove she had rights of custody as to A.F. under Venezuelan law, her prima facie case must fail. The Court pretermits discussion of the third element—exercising rights of custody—as to Petitioner Guevara as she had no custody rights to exercise.

> ### 3. Exercising Custody at Time of Removal

The Convention does not define the term "exercise," but courts have construed the term broadly to avoid courts charged with deciding "exercise" from crossing the line into "consideration of the underlying custody dispute." *Sealed Appellant*, 394 F.3d at 344. "If a person has valid custody rights to a child under the law of the country of the child's habitual residence, that person cannot fail to exercise those custody rights under the Hague Convention short of acts that constitute clear and unequivocal abandonment of the child." *Sealed Appellant*, 394 F.3d at 345. "Accordingly, in the absence of a ruling from a court in the child's country of habitual residence, when a parent has custody rights under the laws of that country, even occasional contact with the child constitutes exercise of those rights." *Sealed Appellant*, 394 F.3d at 345. "To show failure to exercise custody rights, the removing parent must show the other parent has abandoned the child." *Sealed Appellant*, 394 F.3d at 345.

> #### (i) Petitioner Brito

Although Petitioners and Respondent disagree on the amount of involvement Petitioner Brito had with A.F., the Court concludes Petitioner Brito did not "clearly and unequivocally" abandon A.F. Petitioner Brito both testified and presented evidence demonstrating that he financially supported A.F. after he left for Spain, but before Respondent removed A.F. to the United States. Petitioner Brito also communicated with A.F. via video calls and voice messages through Petitioner Guevara's phone and Petitioner Brito's sisters' phones during this time. Petitioner Brito was in constant contact with his mother, Petitioner Guevara, who spent much time with A.F., ensuring she was provided and cared for. Furthermore, Respondent contended that

Petitioner Brito made a limited effort to maintain a relationship with A.F. and provided minimum financial support over the last four years. Such evidence constitutes at minimum "occasional contact." Thus, Petitioner Brito did not "clearly and unequivocally" abandon A.F. Therefore, Petitioner Brito was exercising his custody rights at the time of removal.

In sum, Petitioner Brito has successfully proven by a preponderance of evidence all three elements necessary to make a prima facie case for the return of A.F. to Venezuela.

**D.    Affirmative Defenses**

Even when a court concludes a wrongful removal has occurred, "a return order is not automatic." *Abbott*, 560 U.S. at 22. After a petitioner has established by a preponderance of the evidence that the removal of a child was wrongful, the burden shifts to the respondent to prove that one of the five narrow exceptions—or affirmative defenses—apply. § 9003(e)(2). If the respondent prevails on any of these defenses or exceptions, a court may decline to order the return of the child to the country of his habitual residence. *See Sealed Appellant*, 394 F.3d at 343.

Respondent asserts three affirmative defenses: (1) Petitioners consented to or acquiesced in the removal of A.F; (2) returning A.F. to Venezuela would expose her to a grave risk of physical or psychological harm; and (3) Petitioners waited over a year to file suit and A.F. is well-settled in her new environment in Texas. The first and third defenses asserted by Respondent must be proven by a preponderance of the evidence, while the second defense requires proof of clear and convincing evidence.

*1.    Consent/Acquiescence*

The Convention provides that a child may not be ordered to return to their country of habitual residence if the removing parent establishes that the petitioner "consented to or subsequently acquiesced in the removal or retention." Convention, art. 13(a). "Under Article 13(a), the consent defense involves the petitioner's conduct prior to the contested removal or retention,

while acquiescence addresses whether the petitioner subsequently agreed to or accepted the removal or retention." *Larbie v. Larbie*, 690 F.3d 295, 308 (5th Cir. 2012). For the consent defense, the focus of the inquiry is what the "petitioner actually contemplated and agreed to in allowing the child to travel outside the home." *Larbie*, 609 F.3d at 309. On the other hand, "acquiescence generally requires a more formal type of evidence, such as a custody order or other convincing renunciation of rights." *Larbie*, 609 F.3d at 309.

Respondent asserts that Petitioner Brito shared Respondent's desire to bring A.F. to the United States. Although that desire might have once been shared, at the time of removal, Petitioner Brito did not consent to A.F.'s removal. Petitioners presented evidence of text conversations between Petitioner Brito and Respondent prior to the removal in which Petitioner Brito—repeatedly and emphatically—stated that he disagreed with Respondent taking A.F. to the United States with her. Petitioners further emphasize that—at most—Petitioner Brito shared the desire to bring A.F. to the United States *legally in the future*. Thus, Petitioner Brito's conduct prior to A.F.'s removal fully supports a finding that he did not consent to removal.

As to acquiescence, the bar is slightly higher, as it has been held to require "an act or statement with the requisite formality, such as testimony in a judicial proceeding; a convincing written renunciation of rights; or a consistent attitude of acquiescence over a significant period of time." *Munoz v. Ramirez*, 923 F. Supp. 2d 931, 957 (W.D. Tex. 2013). When examining an acquiescence defense, "each of the words and actions of a parent during the separation are not to be scrutinized for a possible waiver of custody rights." *Munoz*, 923 F. Supp. 2d at 957. Respondent asserts this defense mainly to Petitioner Guevara as she contends Petitioner Brito "consented" to the removal. The Court agrees with Respondent that acquiescence as to Petitioner Guevara is irrelevant as she has no custody rights of A.F. But, as to Petitioner Brito, Respondent argues that

his lack of efforts to facilitate the return of A.F. to Venezuela constitutes acquiescence. However, there is no evidence of such: Petitioner Brito has not renounced his rights, there is no testimony of such in a judicial proceeding, and he has not displayed a consistent attitude of acquiescence over a significant period of time. The lack of formal evidence is detrimental to Respondent's defense— she fails to prove Petitioner Brito consented or acquiesced to the removal of A.F. from Venezuela by a preponderance of the evidence.

2.      *Grave Risk*

Under Article 13(b) of the Convention, a court may decline to return a child to her habitual residence if there is a grave risk that the child's return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation. Convention, art. 13(b). Findings of grave risk are rare—the respondent must "show that the risk to the child is grave, not merely serious." *Soto v. Contreras*, 880 F.3d 706, 710 (5th Cir. 2018). "The principles underlying the Hague Convention require the grave risk must be narrowly construed; otherwise, a broad interpretation would cause the exception to swallow the rule and transform the Convention into an arena for custody disputes." *Soto*, 880 F.3d at 710–11.

There is no evidence before the Court of physical or psychological abuse present in Venezuela that A.F. would be subjected to if returned. In fact, Respondent could not point the Court to any pertinent evidence demonstrating any risk of harm. Respondent merely offered that the return of A.F. would place A.F. in an "intolerable situation" as she is only five years old and no one with any custody rights of her has been to Venezuela since 2021. As the burden for this defense is extremely high—clear and convincing evidence—and Respondent offered next to zero evidence to prove the presence of "grave risk of harm," the Court concludes Respondent has failed to establish this defense.

3.      *Well-Settled*

When a petition for return of a child is commenced in a court more than one year from the date of removal, the respondent can assert an affirmative defense and prevent removal back to the country of habitual residence if respondent proves by a preponderance of the evidence that "the child is now settled into the new environment." Convention, art. 12. "The underlying purpose of this defense is to recognize that at some point a child may become so settled in a new environment that return is no longer in the child's best interests." *Hernandez v. Garcia Pena*, 820 F.3d 782, 787 (5th Cir. 2016). As the term "settled" is not defined in the Convention or implementing legislation, "[t]he State Department has explained that the term requires 'nothing less than substantial evidence of the child's significant connections to the new country,' and that claims should 'be considered in light of evidence . . . concerning the child's contacts with and ties to his or her State of habitual residence.'" *Hernandez*, 820 F.3d at 787 (quoting Hague International Child Abduction Convention; Text and Legal Analysis (State Legal Analysis), 51 Fed. Reg. 10,494, 10,509 (1986)).

The Fifth Circuit has held that the following factors should be considered when analyzing the applicability of this defense:

> (1) the child's age; (2) the stability and duration of the child's residence in the new environment; (3) whether the child attends school or day care consistently; (4) whether the child has friends and relatives in the new area; (5) the child's participation in community or extracurricular activities; (6) the respondent's employment and financial stability; and (7) the immigration status of the respondent and child.

*Hernandez*, 820 F.3d at 787–88. In particular, the Fifth Circuit has emphasized that "immigration status is neither dispositive nor subject to categorical rules, but instead is one relevant factor in a multifactor test." *Hernandez*, 820 F.3d at 788. Analysis of the well-settled defense is an "individualized, fact-specific inquiry"—unique to every case. *Hernandez*, 820 F.3d at 789.

It is undisputed that Respondent and A.F. left Venezuela on November 27, 2021. It is also undisputed that Petitioners filed the Petition on April 19, 2023. Thus, the Petition for the return of A.F. was filed more than one year after the date of the removal of A.F. from Venezuela. Accordingly, the question here becomes whether Respondent has proven by a preponderance of the evidence that A.F. is now well settled in her new environment in Texas.

After thorough consideration of the factors listed above, the Court concludes the evidence demonstrates that A.F. has formed significant connections to her new environment in Texas. The only two factors that do not support Respondent's defense are the first and seventh—neither of which are dispositive. Here, as A.F. is only five years old, she is a "very young child not able to form the same level of attachments and connections to a new environment as an older child." *Hernandez*, 820 F.3d at 789. Thus, the first factor—the child's age—does not support a finding of well settled. As to the seventh factor, it is undisputed that both Respondent and A.F. do not have Lawful Permanent Residence status in the United States, but they both have actively pending asylum applications and are currently awaiting their asylum interview with USCIS. In fact, Respondent and A.F. surrendered themselves to border patrol immediately upon entry into the United States. Thus, even though they have not achieved "Green Card" status, Respondent and A.F. are in the midst of the proper procedures to achieve lawful status in the United States. Further, both Respondent and A.F. have received employment authorization documentations from the USCIS. Aside from those two non-dispositive, lukewarm factors, the other five factors overwhelmingly support a finding of well settled.

As to factor two, A.F. has lived in Texas—specifically the Dallas area—since arriving in the United States. A.F. has lived with Respondent and Respondent's partner, Mr. Otton Rodriguez, at two locations during this period of time. Thus, A.F. has lived in the Dallas area for over two

years with stable housing throughout the entire duration as she was subject to just one move since her arrival in the United States. The third and fourth factors the Court must consider are whether the child attends school or daycare consistently, and whether she has friends or relatives in the new area. A.F. received daily care from one individual from the time she arrived in the United States until October 2022, and then from a family member from October 2022 until she started kindergarten in August 2023, which she presently attends. A.F. attends school with her cousin and they both go to her aunt's house for two hours after school every day. A.F. has many friends outside of her family with whom she has been photographed. Evidence was also presented of A.F.'s nomination for the Gifted and Talented Program at school—where she receives bilingual education—as well as evidence of her report cards, which displayed continuing academic improvement. Thus, A.F. has consistently attended daycare and/or school, and has relatives and friends in the area whom she interacts with routinely.

The fifth factor pertains to the child's participation in extracurricular or community activities. The evidence presented to support this factor was overwhelming: A.F. regularly attends church in Dallas with Respondent and Mr. Rodriguez; she has a primary care physician whom she sees regularly; she goes on trips with her family, such as to Disney World; she has playdates with friends from school; she is learning English; she plays at community playgrounds; she goes swimming and attends birthday parties, to state a few. Lastly, factor six pertains to the respondent's financial and employment status. Here, Respondent has held four different jobs since arriving in the United States, with each subsequent job having a higher salary than the one before. She has been gainfully employed since arriving in the United States and provides for A.F. As mentioned above, A.F. and Respondent live with Mr. Rodriguez who contributes financially. Respondent and Mr. Rodriguez split their rent payment, Respondent makes monthly car payments for Mr.

---

Rodriguez's car that they share, Respondent has healthcare for herself and A.F., and Respondent and Mr. Rodriguez share the cost of utilities. On questioning from Petitioners, Respondent further asserted that if she was to ever split from Mr. Rodriguez, she and A.F. would move to a cheaper apartment so their cost of living was lower and her inability to split payments would be a non-issue.

Viewing each factor as part of a very fact-specific, multi-factor test, the Court concludes Respondent has met her burden of proving by a preponderance of the evidence that A.F. is well settled in her new environment in Texas. Thus, it is no longer in the best interests of A.F. to return to Venezuela, where she has minimal connections and no memories of living there. The Court Orders that the minor, A.F., remain in the United States with Respondent.

### IV.  JUDGMENT

Although Petitioner Brito successfully established his prima facie case, the Court finds Respondent sufficiently established that A.F. is well-settled in Dallas. Thus, the Court finds it is in A.F.'s best interest to deny Petitioners' Hague Petition in support of the Convention's goal of not only protecting children from wrongful removal, but also protecting children from a second removal from a new environment to which they have become connected and settled. Accordingly, the Court hereby **DENIES** Petitioners' Petition for Return of Child under the Hague Convention. (ECF No. 1).

**SO ORDERED:** May 8, 2024.

ADA BROWN
UNITED STATES DISTRICT JUDGE